**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN**

| | | |
|---|---|---|
| **YIEH PHUI ENTERPRISE CO., LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Consol. Ct. No. 26-00746** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**
**ON BEHALF OF PLAINTIFF YIEH PHUI ENTERPRISE CO., LTD.**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff Yieh Phui Enterprise Co., Ltd. ("Yieh Phui"), hereby moves for judgment upon the agency record requesting remand of certain aspects of the final determination issued by the U.S. Department of Commerce ("Commerce") in the antidumping investigation of Certain Corrosion-Resistant Steel Products from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 42210 (Dep't Commerce Aug. 29, 2025), P.R. 326, and accompanying Issues and Decision Memorandum ("Final Decision Memo"), P.R. 323 (collectively, "Final Determination").

For the reasons set forth in the accompanying Memorandum of Points and Authorities in Support of this Motion, Commerce's determination in the Final Determination was not supported by substantial evidence or in accordance with law.  Consequently, judgment should be entered for Yieh Phui, Commerce's Final Determination should be remanded, and a new antidumping margin should be calculated for Yieh Phui consistent with the relief requested by Yieh Phui as supported by the accompanying Memorandum of Points and Authorities.

A proposed order accompanies this motion.  A counsel certification of compliance with Chambers Procedures Part 2(B)(2) is attached to the Memorandum of Points and Authorities in Support of this Motion.

Respectfully submitted,

  /s/ Kelly A. Slater  
Kelly A. Slater, Esq.
Jay Y. Nee, Esq.
Edmund W. Sim, Esq.

Appleton Luff Pte Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(301) 649-2149

Dated:  July 21, 2026                    Counsel to Yieh Phui

2

**PUBLIC VERSION**

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE GARY S. KATZMANN**

|  |  |  |
|---|---|---|
| **YIEH PHUI ENTERPRISE CO., LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Consol. Ct. No. 26-00746** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLANTIFF YIEH PHUI ENTERPRISE CO., LTD.'S**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Kelly A. Slater, Esq.
Jay Y. Nee, Esq.
Edmund W. Sim, Esq.

Appleton Luff Pte Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(301) 649-2149

Counsel to Yieh Phui Enterprise Co., Ltd.

PUBLIC VERSION

**TABLE OF CONTENTS**

RULE 56.2 STATEMENT ................................................................................................ 1

I.    STATEMENT OF FACTS ..................................................................................... 2

A.    **Facts Relevant to Commerce's Cost-Based PMS Determination** ...................................... 3

    1.    Evidence Concerning the "Particularity" Requirement .......................................... 4

    2.    Evidence Concerning Market Penetration and Level of Price Reduction, Versus a Market Participant's Pricing Behavior .................................................................. 4

    3.    Comparison Between Normal Value and Export Price or Constructed Export Price ......... 6

    4.    Commerce's Prior Practice Regarding Cost-Based PMS Findings Vis á Vis the Cost-Based PMS Decision Made in the Final Determination ....................................... 7

B.    **Evidence Regarding Commerce's Sales-Based PMS Determination** .............................. 7

    1.    Data Concerning Imports of Chinese HRC into Taiwan ....................................... 8

    2.    Data Concerning Imports of Chinese CORE into Taiwan .................................... 8

C.    **Evidence Relied Upon in the *Final Determination* Regarding the Proper Data Source to Use in Making Cost-Based PMS Adjustments** ............................................ 9

ARGUMENT ............................................................................................................... 10

II.   STATEMENT OF LAW ...................................................................................... 13

A.    **Standard of Review** .......................................................................................... 13

B.    **Statement of Law with Respect to Commerce PMS Decisions** ..................................... 14

III.  COMMERCE'S DECISION REGARDING A COST-BASED PMS FINDING AS REGARDS PLAINTIFF IN THE FINAL DETERMINATION WAS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE ............................. 15

A.    **Commerce's Finding that Chinese HRC Imports into Taiwan Were "Particular" to Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence** ...... 16

B.    **Commerce's Market Distortion Finding of HRC in Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence** ........................................... 19

    1.    Commerce failed to make the statutory finding that Yieh Phui's cost for steel coils did not "accurately reflect the cost of production in the ordinary course of trade" .......... 19

    2.    Commerce failed to properly weigh the record evidence in reaching its market-distortion finding with respect to HRC prices in Taiwan .................................... 21

    3.    Commerce Failed to Establish That the Alleged Market Distortions in the Taiwanese HRC Market Prevented a Proper Comparison for CORE ................................. 25

IV.   COMMERCE'S DECISION REGARDING A SALES-BASED PMS FINDING AS
      REGARDS PLAINTIFF IN THE FINAL DETERMINATION WAS CONTRARY
      TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE.............................. 27

A.    Commerce's Sales-Based PMS Finding Based on Alleged Low-Priced Chinese HRC
      Imports into Taiwan Was Contrary to Law and Unsupported by Substantial Record
      Evidence ............................................................................................................... 28

   1.   Commerce's Sales-Based PMS Finding Based on Alleged Low-Priced Chinese
        Imports of CORE Into Taiwan Was Contrary to Law and Unsupported by Substantial
        Record Evidence ................................................................................................ 30

   a.   The alleged low-priced imports of Chinese CORE into Taiwan were not "particular"
        to Taiwan.......................................................................................................... 30

   b.   Commerce failed to properly weigh the record evidence in reaching its market-
        distortion finding with respect to Taiwan's CORE market ................................. 33

D.    COMMERCE'S CHOICE OF DATA SOURCE IN MAKING THE COST-BASED
      PMS ADJUSTMENT DOES NOT REPRESENT THE MOST REASONABLE AND
      BEST AVAILABLE INFORMATON ON THE RECORD.............................................. 35

CONCLUSION…………………………………………………………………………….39

PUBLIC VERSION

## TABLE OF AUTHORITIES

### CASES

Chevron, U.S.A., Inc. v. Natural Res. Def. Council Inc., 467 U.S. 837 (1984) ........................... 13

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938) ...................................................................... 13

Husteel Co., Ltd. v. United States, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020) ........................................................................................... 17, 22, 25, 27, 34

Koyo Seiko Co. v. United States, 769 F. Supp. 1526 (Ct. Int'l Trade 1992) ................................. 13

Nexteel Co., Ltd. v. United States, 28 F. 4th 1226 (Fed. Cir. 2022) ..................... 15, 17, 21, 31, 33

Nexteel Co., Ltd. v. United States, 450 F. Supp. 3d 1333 (Ct. Int'l Trade 2020) ......................... 27

Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) ................................ 14

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ...................................................... 14

### STATUTES

19 U.S.C. § 1516a(b)(1)(B) .......................................................................................................... 13

19 U.S.C. § 1677(15) .................................................................................................................... 14

19 U.S.C. § 1677b ...................................................................................................... 16, 17, 31, 33

19 U.S.C. § 1677b(15) .................................................................................................................. 19

19 U.S.C. § 1677b(e) ...................................................................................................... 14, 19, 26, 35

19 U.S.C. § 1677b(e)(1) ................................................................................................................ 19

U.S.C. § 1677b(e) ......................................................................................................................... 17

### OTHER AUTHORITIES

Trade Preferences Extension Act of 2015, 129 Stat. 362, Pl. L. No. 114-27 (June 29, 2015) ...... 14

### REGULATIONS

19 C.F.R. § 351.416(g)(1) ............................................................................................................... 7

PUBLIC VERSION

## RULE 56.2 STATEMENT

Yieh Phui Enterprise Co., Ltd. ("Yieh Phui" or "Plaintiff"), a Taiwanese producer and exporter of corrosion-resistant steel products ("CORE"), brings this action to challenge the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of CORE from Taiwan.[1]  The Final Determination was subsequently amended, in part, with respect to the investigation of subject imports from Brazil and Mexico in response to ministerial error allegations submitted by Petitioners Nucor Corporation, Steel Dynamics, Inc., United States Steel Corporation, Wheeling-Nippon Steel, Inc., and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (collectively, "Petitioners").

Based on the allegations submitted with respect Brazil and Mexico, Commerce's final decision covering all subject countries and antidumping duty orders was published as Corrosion-Resistant Steel Products From Brazil and Mexico: Amended Final Antidumping Duty Determination; Corrosion-Resistant Steel Products From Australia, Brazil, Canada, Mexico, the Netherlands, South Africa, Taiwan, the Republic of Turkiye, the United Arab Emirates, and the Socialist Republic of Vietnam: Antidumping Duty Orders, 90 Fed. Reg. 59494 (Dep't Commerce Dec. 19, 2025), P.R. 336 ("AD Order") which included a 10.85% antidumping duty (AD) margin for Plaintiff Yieh Phui.  Plaintiff seeks relief from this Court: (a) to vacate the Final Determination and the subsequent AD Order, and (b) to remand it to Commerce for further proceedings.

---

[1] See Certain Corrosion-Resistant Steel Products from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 42210 (Dep't Commerce Aug. 29, 2025), P.R 326, and accompanying Issues and Decision Memorandum, P.R. 323 ("Final Decision Memo") (collectively, "Final Determination").

Yieh Phui seeks judgment on the agency record with respect to three issues:

1. Whether Commerce's decision regarding a cost-based particular market situation ("PMS") finding with respect to Plaintiff in the Final Determination was contrary to law or otherwise unsupported by substantial evidence;

2. Whether Commerce's decision regarding a sales-based PMS finding with respect to Plaintiff in the Final Determination was contrary to law or otherwise unsupported by substantial evidence; and

3. Whether Commerce's decision regarding the data source used in making the cost-based PMS adjustment with respect to Plaintiff in the Final Determination was contrary to law or otherwise unsupported by substantial evidence.

## I.    STATEMENT OF FACTS

In the antidumping duty investigation contested here, Petitioners alleged that the cost of producing CORE in Taiwan during the period of investigation ("POI") was distorted by a surge of Chinese hot-rolled coil ("HRC"), a primary material input, that depressed prices for HRC in Taiwan,[2] a type of PMS characterized by Commerce as a cost-based PMS.  Petitioners did not explicitly make an allegation on what Commerce characterized as a sales-based PMS in their PMS allegations.  Commerce did not address Petitioners' PMS allegation on its initial preliminary determination.   Instead, Commerce made its initial decision on PMS in a post-preliminary determination.[3]

In its Post-Prelim. Determination, Commerce preliminarily found that both a cost- and

---

[2] See Letter from Petitioners to Commerce Re: Certain Corrosion-Resistant Steel Products from Taiwan: Particular Market Situation Allegation and Supporting Factual Information, Feb. 18, 2025, at 9-19, C.R. 103-105, P.R. 165-167 ("PMS Allegation").

[3] See generally Memorandum From S. Fullerton to C. Abbott Re: Post-Preliminary Analysis for the Less-Than-Fair-Value Investigation of Certain Corrosion-Resistant Steel Products from Taiwan, July 23, 2025, ("Post-Prelim. Analysis Memo"), C.R. 210, P.R. 301; Memorandum from P. Cox to the File Re: Yieh Phui Enterprise Co., Ltd. Post-Preliminary Sales Analysis Memorandum, July 23, 2025 ("Post-Prelim. Sales Memo") C.R. 214, P.R. 305; and Memorandum from C. Winfield to G. Lee Re:  Cost of Production and Constructed Value Calculation Adjustments for the Post-Preliminary Determination – Yieh Phui Enterprise Co., Ltd., July 23, 2025, C.R. 215, P.R. 307 ("Post-Prelim. Cost Memo") (collectively, "Post-Prelim. Determination").

sales-based PMS existed in Taiwan during the POI.[4]   As a result of a cost-based PMS finding, Commerce made an upward adjustment of [   ] percent to Plaintiff's cost of HRC, a primary material input to manufacture CORE, the subject merchandise, for the calculation of constructed value ("CV").[5]  Commerce also disregarded all of Plaintiff's home market sales in the dumping margin calculations and instead used CV for comparison with Plaintiff's U.S. prices.[6] Commerce then calculated a dumping rate of 10.85% for Plaintiff in the Post-Prelim. Determination.

The following summarizes the relevant facts for each issue presented for the Court's review, including the arguments made by Plaintiff in Commerce's final phase of the administrative proceeding as well as Commerce's final decisions and the reasoning thereof.

### A.      Facts Relevant to Commerce's Cost-Based PMS Determination

In the Final Determination, Commerce continued to find that the large import volume of low-priced HRC from China during the POI distorted the domestic price of HRC in Taiwan and, therefore the production cost of CORE.[7]  Commerce reasoned that

> {T}he large import volumes of low-priced HRC from China during the POI distorted the domestic price of HRC in Taiwan and, therefore, the production costs of CORE.  As explained in the Post-Preliminary Analysis, China's dominance in the global steel industry as the world's largest steel producer is well-documented, and Commerce has previously found China's capacity and production compared to the rest of the world to have a distortive impact on global markets under the TPEA.  Indeed, during 2023 and 2024 (*i.e.*, the years included in the POI), China accounted for six times the global production of steel compared to the next largest producing country.  As detailed in the Post-Preliminary Analysis, there was a significant increase in HRC imports from China into Taiwan between 2021 and 2024.41 Specifically, the percentage of Chinese HRC imports into Taiwan as a share of total HRC imports into Taiwan increased from 3.06 percent in 2021 to 56.14 percent in 2024.  Further, while imports of Chinese HRC into Taiwan increased from 2021 through 2024, the average unit

---

[4] See Post-Prelim. Analysis Memo at 7-13, C.R. 210, P.R. 301.
[5] See id. at 13-18.
[6] See id. at 11-13.
[7] See Final Decision Memo at 8-15, P.R. 323.

price of HRC imports into Taiwan decreased by over 30 percent, and prices for imports of HRC from China in 2023 and 2024 were lower than prices from all countries and the Taiwanese HRC market as a whole. Finally, as stated in the Post-Preliminary Analysis, the distortion in the price of HRC is significant to the production of CORE from Taiwan because of the large percentage HRC accounts for in the cost of manufacture for CORE during the POI.[8]

### 1. Evidence Concerning the "Particularity" Requirement

Although Plaintiff argued that imports of Chinese HRC were not "particular" to Taiwan, Commerce relied on its own regulation and determined that Chinese HRC "specifically" affected the Taiwanese HRC market.[9] Commerce reasoned that "Chinese overcapacity had a distortive impact on global steel markets during the POI and that this global overcapacity contributed to a distortion in the cost of HRC in Taiwan during the POI."[10] According to Commerce, it "did not determine that the PMS existed in all countries."[11] Instead, Commerce "determined that Chinese dominance in the global steel industry as a supplier of HRC, as evidenced by the increasing import volume and decreasing prices of Chinese HRC into Taiwan, specifically affected the Taiwanese market for this product (i.e., HRC)."[12]

### 2. Evidence Concerning Market Penetration and Level of Price Reduction, Versus a Market Participant's Pricing Behavior

Despite Plaintiff's argument that Chinese HRC imports had minimal market penetration (only 3.27% and 6.56% in 2023 and 2024, respectively) in Taiwan during the POI, and that Commerce unreasonably assigned a more significant weight to a *Taipei Times* article describing a price-cutting plan by Taiwan's largest steelmaker rather than to evidence showing low market penetration, Commerce nonetheless maintained its position. Commerce found that

---

[8] Id. at 11.
[9] See id. at 11-12.
[10] Id. at 12.
[11] Id.
[12] Id. (emphasis added).

{A} decision by Taiwan's largest steelmaker to lower prices in response to imports of Chinese HRC indicates that imports of HRC from China had a substantial impact on Taiwan's domestic HRC prices during the POI, regardless of the relatively low levels of market penetration.[13]

In addition, Commerce also rejected Plaintiff's argument that the timing of the reported price cutting plan was not contemporaneous to the POI and concluded that "though the formal execution of the plan came shortly after the end of the POI. . .decisions made with respect significant business decisions are planned well in advance."[14]

Furthermore, Plaintiff argued that the *Taipei Times* news article does not provide support for a cost-based PMS finding because the downward price pressure was not entirely attributable to Chinese imports of HRC, but also due to other factors such as extreme weather, financial market turmoil and the off-season effect in summer as demonstrated by the record evidence, Commerce rejected this argument too and concluded that "{a}lthough Taiwanese producers of HRC may have faced other negative market forces in addition to the low-priced HRC imported from China," Commerce's own regulations "do not require market distortions to be 'entirely attributable' to a single factor."[15]

Finally, Plaintiff argued that even if Chinese imports of HRC contributed in some way to the reported August 2024 price-reduction plan announced by Taiwan's dominant HRC producer, China Steel Corporation ("CSC"), those imports did not have a substantial impact on the Taiwanese HRC industry sufficient to distort domestic HRC prices.[16]  Plaintiff pointed to the *Taipei Times* article that Commerce relied upon in reaching its market-distortion finding and

---

[13] Id. at 12.
[14] Id. at 13.
[15] Id.
[16] See Yieh Phui Letter to Commerce Re: Corrosion-Resistant Steel Products from Taiwan, Case Brief, Aug. 1, 2025, at 9-10, C.R 216, P.R. 312 ("Yieh Phui Case Brief").

explained that the reported price reduction by CSC for HRC was only 600 NTD per metric ton.[17]

Even assuming CSC implemented this reduction entirely in response to Chinese HRC imports

during the POI, the magnitude of the reduction was minimal, not substantial.[18]  Plaintiff further

cited record evidence showing that its verified POI-average HRC consumption cost was [      ]

NTD/MT.[19]  A 600 NTD/MT reduction represents only [    ]% (= 600 ÷ [        ]) of Plaintiff's

average HRC consumption cost during the POI.[20]  A price effect of this size is admittedly very

small and does not support Commerce's conclusion that Chinese imports distorted domestic

HRC prices in Taiwan.  Commerce, however, failed to address this argument and the record

evidence in support of it in the Final Determination.

### 3. Comparison Between Normal Value and Export Price or Constructed Export Price

Despite Plaintiff's argument that even if the alleged Chinese imports of HRC distorted the

Taiwanese HRC market and in turn the cost of production of CORE, record evidence did not

establish that such distortion would prevent a proper comparison between normal value and

export price or constructed export price.[21]  Nor did Commerce sufficiently explain how

distortions to Yieh Phui's HRC costs would prevent a proper comparison between Yieh Phui's

home market sales (or CV) and U.S. sales.[22]  Instead, in the Final Determination Commerce

again rejected Plaintiff's arguments and stated that "distortions in the price of HRC combined

with distortions in the price of CORE create a PMS that prevents a proper comparison with U.S.

---

[17] See id. at 9.
[18] See id. at 9-10.
[19] Id. at 9.
[20] Id.
[21] See id. at 10-11.
[22] See id.

price."[23]  Commerce's reasoning on this point, however, implied that it did acknowledge that

HRC imports from China alone did not prevent a proper comparison with U.S. price.

### 4. Commerce's Prior Practice Regarding Cost-Based PMS Findings Vis á Vis the Cost-Based PMS Decision Made in the Final Determination

Commerce also rejected Plaintiff's claim that the PMS finding was inconsistent with past

cases, explaining that each PMS determination is fact-specific and that the record in the now-

contested investigation differs from those of earlier proceedings.[24]  According to Commerce,

Chinese HRC imports into Taiwan rose sharply—from 3.06 percent in 2021 to more than half of

all imports by the POI.[25]  Commerce found that these conditions matched the example in 19

C.F.R. § 351.416(g)(1), which describes a PMS arising when global overcapacity in a key input

distorts that input's price or cost in the subject country.[26]  Based on evidence showing China's

steel overcapacity and large volumes of low-priced Chinese HRC entering Taiwan, Commerce

concluded that domestic HRC prices in Taiwan were distorted and that a cost-based PMS existed

in Taiwan during the POI.[27]

### B.    Evidence Regarding Commerce's Sales-Based PMS Determination

In the Final Determination, Commerce continued to find a sales-based PMS based on the

following circumstances: (1) the large imports of low-priced Chinese HRC into Taiwan during

the POI, and (2) the imports of CORE into Taiwan during the POI.[28]  As a result of this finding,

---

[23] Final Decision Memo at 14, P.R. 323.
[24] See id. at 14-15.
[25] See id.
[26] See id.
[27] See id.
[28] See id. at 16.

Commerce disregarded all of Plaintiff's home market sales and instead used CV in calculating Plaintiff's dumping margin.[29]

### 1.    Data Concerning Imports of Chinese HRC into Taiwan

Commerce found that low-priced Chinese HRC imports into Taiwan during the POI distorted the price of HRC, a major input in CORE production.[30]  Because HRC constitutes a significant portion of CORE's cost, Commerce concluded that distortions in HRC prices necessarily distorted CORE prices.[31]  Commerce cited CSC's announcement of price reductions for both HRC and CORE due to "China's excessive exports of low-priced products" as corroborating evidence.[32]  Commerce rejected Yieh Phui's argument that Chinese HRC and CORE imports did not support a PMS, stating that the same reasoning supporting its cost-based PMS finding also supported its sales-based PMS finding.[33]

### 2.    Data Concerning Imports of Chinese CORE into Taiwan

Commerce found that declining prices of Chinese CORE imported into Taiwan contributed to a PMS.[34]  In response to Plaintiff's argument that Commerce failed to show how these imports were "particular" to Taiwan, Commerce explained that a market situation may be "particular" even if similar conditions exist elsewhere, so long as the distortion affects prices in the subject country.[35]  According to Commerce, record evidence showed that "China's overcapacity has a distortive impact on global steel markets" and that "the prices of Chinese imports of CORE into Taiwan declined more significantly between 2023 and 2024 than the

---

[29] See id. at 20.
[30] See id. at 16-17.
[31] See id.
[32] Id. at 17.
[33] See id.
[34] See id. at 17-18.
[35] See id. at 17.

prices of imports of CORE from all countries."[36]  In addition, Commerce found that CSC's announcement of domestic CORE price reductions further supported the finding of a particular and distortive impact.[37]

On this front, Plaintiff argued that Chinese CORE imports represented only 1.72% and 3.05% of Taiwan's apparent consumption in 2023 and 2024, respectively, and that Commerce improperly gave greater weight to CSC's price-cutting announcement for CORE.[38]  Plaintiff also argued that, even assuming CSC price-cutting plan was implemented and was entirely attributable to Chinese imports of CORE, the reported price reduction of 500 NTD/MT was minimal, representing merely a price decrease of [    ]% of Plaintiff's POI-average home market sales price of the same type of CORE.[39]  Commerce rejected these arguments, stating that

> {A} decision by Taiwan's largest steelmaker to lower prices in response to imports of Chinese CORE indicates that imports of CORE from China had a distortive effect on Taiwan's domestic CORE prices during the POI, regardless of the level of price reduction or the level of market penetration.[40]

Finally, despite the fact that Plaintiff argued that (1) CSC's price reduction plan for CORE was not relevant to the POI; and (2) CSC's price reduction plan for CORE was not entirely attributable to Chinese imports of CORE, Commerce was not persuaded by these arguments and continued to find a sales-based PMS existed during the POI with respect to the prices of CORE in Taiwan.[41]

C.    **Evidence Relied Upon in the *Final Determination* Regarding the Proper Data Source to Use in Making Cost-Based PMS Adjustments**

---

[36] Id.
[37] Id. at 18.
[38] See id.
[39] See Yieh Phui Case Br. at 20, C.R 216, P.R. 312.
[40] Final Decision Memo at 18, P.R. 323.
[41] See id.

PUBLIC VERSION

In the Final Determination, Commerce continued to adjust Plaintiff's reported HRC costs upwards by [    ] percent in calculating CV as a result of its cost-based PMS finding.[42] According to Commerce, this [  ] percent adjustment was calculated based on the price difference between the average HRC price paid by Plaintiff during the POI and the average price for hot-rolled band steel ("HRB") in the United States and Europe reported by *SteelBenchmarker*, a market intelligence report, that had been submitted by Petitioners.[43]

Despite the fact that Plaintiff argued that Commerce should use CSC's reported price-reduction levels from a *Taipei Times* article to quantify the PMS adjustment, since Commerce had relied on the same article in finding a PMS in the first place, Commerce rejected this argument, explaining that the Taiwanese HRC and CORE markets were found to be distorted by the PMS.[44]  The prices, or changes in prices, from a distorted market are inherently unreliable for "undistorting" costs.[45]  Using CSC's reported price reductions would require Commerce to rely on the very market distortions it found unreliable.[46]  Accordingly, Commerce concluded that *SteelBenchmarker* data, drawn from markets not affected by the PMS, provided a more reasonable benchmark.[47]  Thus, based on these factors and analysis, in the Final Determination Commerce elevated Plaintiff's antidumping duty margin rate from a preliminary rate of 2.64% to a final rate of 10.85%.

**ARGUMENT**

## I.    SUMMARY OF ARGUMENT

---

[42] See Post-Prelim. Analysis Memo at 13-15, C.R. 210, P.R. 301; see also Final Decision Memo at 18-21, P.R 323.
[43] See Post-Prelim. Analysis Memo at 14-15, C.R. 210, P.R. 301.
[44] See Final Decision Memo at 20-21, P.R 323.
[45] See id. at 21.
[46] See id.
[47] See id.

Plaintiff respectfully submits that Commerce's Final Determination rests on cost-based and sales-based PMS findings—findings that in this case are very much intertwined—are contrary to law and unsupported by substantial evidence. Commerce departed from the statutory requirements of 19 U.S.C. § 1677b by finding a PMS without demonstrating that the alleged conditions were particular to Taiwan, that Plaintiff's costs failed to reflect production costs in the ordinary course of trade, or that any alleged distortion prevented a proper comparison between normal value and U.S. price. Because Commerce relied on generalized evidence of Chinese steel overcapacity and global market pressure, rather than Taiwan-specific evidence, the Final Determination should be remanded on this basis.

With respect to Commerce's specific cost-based PMS finding, the record does not show that Chinese imports of HRC were unique to, targeted toward, or specific to Taiwan. The evidence on which Commerce relied, including the *Taipei Times* article, instead describes China's excessive steel exports as a global phenomenon affecting multiple markets. Under controlling precedent, such generalized global conditions do not satisfy the statutory requirement that a PMS be particular to the subject market or producers of the subject merchandise.

Commerce also failed to establish the market-distortion findings required to justify a cost-based PMS adjustment. It did not determine what Plaintiff's HRC costs would have been in the ordinary course of trade, did not show that Plaintiff's actual HRC costs were distorted, and did not reasonably weigh contrary record evidence. In particular, Commerce disregarded the limited magnitude of CSC's reported price reductions, the low market penetration of Chinese HRC imports, and the fact that CSC's announced price-cutting plan post-dated the period of investigation. Commerce's reliance on assumptions and isolated price announcements therefore does not constitute substantial evidence.

11

In addition, Commerce did not establish that alleged distortions in the Taiwanese HRC market prevented a proper comparison for CORE. Any alleged reduction in HRC input costs would affect both home-market and U.S. sales of CORE, and alleged distortions in the downstream CORE market could not justify an upward adjustment to Plaintiff's upstream HRC costs. Commerce's theory that HRC and CORE distortions, viewed together, prevented a proper comparison is unsupported where neither asserted factor independently satisfies the statutory standard.

Commerce's sales-based PMS finding suffers from the same legal and evidentiary defects. Commerce improperly disregarded Plaintiff's home-market sales based on alleged low-priced Chinese imports of HRC and CORE, even though the record did not show that those imports were particular to Taiwan, materially distorted the Taiwanese market, or prevented a proper comparison with U.S. prices. For CORE in particular, Commerce again relied on generalized evidence of Chinese overcapacity and a post-POI CSC price announcement while failing to address low market penetration, the minimal size of the reported price reduction, and the absence of contemporaneous evidence tying the alleged distortion to the period of investigation.

Finally, even assuming Commerce could lawfully find a cost-based PMS, its [   ] percent adjustment methodology was unreasonable and unsupported by the best available information. Commerce relied on broad U.S. and European *SteelBenchmarker* data to increase Plaintiff's Taiwan-specific HRC costs, while rejecting Taiwan-specific evidence from the very *Taipei Times* article Commerce otherwise relied upon to establish market impact. Commerce's selected benchmark did not reasonably correspond to the alleged Taiwan-specific distortion and therefore cannot support the resulting adjustment.

12

For these reasons, Plaintiff requests that the Court hold Commerce's cost-based PMS finding, sales-based PMS finding, and resulting cost adjustment are contrary to law and unsupported by substantial evidence, and remand the Final Determination for reconsideration consistent with the Statute, controlling precedent, and the record evidence.

## II.    STATEMENT OF LAW

### A.    Standard of Review

The Court must remand any administrative determination by Commerce which is "unsupported by substantial evidence on the record" as a whole, or is "otherwise not in accordance with the law." See 19 U.S.C. § 1516a(b)(1)(B); Koyo Seiko Co. v. United States, 769 F. Supp. 1526, 1528 (Ct. Int'l Trade 1992).

Commerce acts contrary to law where it acts arbitrarily or based on an impermissible interpretation of its statutory authority. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council Inc., 467 U.S. 837, 842-43 (1984). When reviewing Commerce's interpretation of the antidumping statute, the Court first determines "whether Congress has directly spoken on the precise question at issue. Where the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. Where, on the other hand, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). The substantial evidence standard of review essentially asks whether, given the evidence

on the record as a whole, the agency's conclusion was reasonable.  See Nippon Steel Corp. v.

United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

### B.      Statement of Law with Respect to Commerce PMS Decisions

Under 19 U.S.C. § 1677b(e), as amended by Section 504 of the Trade Preferences

Extension Act of 2015 ("TPEA"),[48] Commerce may use "any other calculation methodology"

when calculating CV if a PMS exists such that the cost of materials and fabrication or other

processing does not accurately reflect the cost of production in the ordinary course of trade.[49]

Although the Statute does not define "particular market situation" *per se*, the plain language of §

1677b(e) identifies the factual showing Commerce must make to invoke that provision:

Commerce must find that the costs incurred to produce the subject merchandise "do[] not

accurately reflect the cost of production in the ordinary course of trade."  The TPEA also

amended the definition of "ordinary course of trade" under 19 U.S.C. § 1677(15) to include

"{s}ituations in which the administering authority determines that the particular market situation

prevents a proper comparison with the export price or constructed export price."[50]

The TPEA also amended the definition of "ordinary course of trade" under 19 U.S.C.

§ 1677(15) to include "{s}ituations in which the administering authority determines that the

particular market situation prevents a proper comparison with the export price or constructed

export price" (emphasis added).  Plaintiff's position is that, under the aforementioned statutory

amendments, Commerce's Final Determination is not based on substantial evidence and is

otherwise contrary to law because it fails to satisfy the "particularity" requirement, as that

remains required by law, taking consideration of the amendments to it. The "particularity"

---

[48] See Trade Preferences Extension Act of 2015, 129 Stat. 362, Pl. L. No. 114-27 (June 29, 2015) at Sec. 504 (entitled "Particular Market Situation") ("TPEA").
[49] Id.
[50] Id.

14

requirement remains the law under both cost- and sales-based PMS evaluations made by

Commerce based on the evidence before the agency.  The legal standard of review of those

decisions has also not changed.  Several Court decisions support the position we advocate here,

as explained in further detail below.

### III.  COMMERCE'S DECISION REGARDING A COST-BASED PMS FINDING AS REGARDS PLAINTIFF IN THE FINAL DETERMINATION WAS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

As explained above, Commerce currently may use "any other calculation methodology"

when calculating CV if a PMS exists such that the cost of materials and fabrication or other

processing does not accurately reflect the cost of production in the ordinary course of trade.  As

this Court has held, however, and as the U.S. Court of Appeals for the Federal Circuit ("CAFC")

subsequently affirmed, the circumstances supporting a PMS determination must be particular to

producers of the subject merchandise during the relevant period.[51]  The CAFC has further

explained that "{a}n ongoing global phenomenon would not alone constitute a deviation from

the 'ordinary course of trade.'"[52]  With respect to market-distortion findings, the CAFC has

stated the following:

> Nothing in the statute requires Commerce to quantify the distortion precisely.
> Still, a quantitative comparison showing a difference between costs incurred and
> costs in the ordinary course of trade could be substantial evidence supporting the
> existence of a particular market situation.  Likewise, evidence that costs do not
> differ at all from what they would have been in the ordinary course of trade would
> 'fairly detract [ ] from the substantiality of the evidence.'"[53]

---

[51] See Nexteel Co., Ltd. v. United States, 28 F. 4th 1226, 1234 (Fed. Cir. 2022) ("Nexteel II") (citing SeAH Steel Corp. v. United States, 513 F. Supp. 3d 1367, 1393 (Ct. Int'l Trade 2021)).
[52] Id.
[53] Id.

15

In the Final Determination, Commerce found a cost-based PMS existed during the POI with respect to Taiwan's domestic HRC market.[54] According to Commerce, the allegedly distorted HRC prices in Taiwan in turn distorted the cost of production of CORE.[55] As a result of a cost-based PMS finding, Commerce made an upward adjustment to Plaintiff's cost of HRC, a primary material input used by Plaintiff to manufacture CORE, when calculating CV in the Final Determination.[56] As explained below, Commerce's cost-based PMS finding was contrary to law and unsupported by substantial record evidence.

A. **Commerce's Finding that Chinese HRC Imports into Taiwan Were "Particular" to Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence**

In the Final Determination, Commerce found that the large import volume of low-priced hot-rolled coil ("HRC") from China during the POI distorted the domestic price of HRC in Taiwan and, therefore, the production cost of CORE. Despite Plaintiff's argument that the alleged Chinese imports of HRC were not "particular" to Taiwan, Commerce "determined that Chinese dominance in the global steel industry as a supplier of HRC, as evidenced by the increasing import volume and decreasing prices of Chinese HRC into Taiwan, specifically affected the Taiwanese market for this product (*i.e.*, HRC), in particular."[57] Commerce, however, failed to meet the statutory "particularity" requirement under 19 U.S.C. § 1677b in a manner consistent with prior holdings of this Court and the CAFC.

As noted above, the Statute does not define the term "particular market situation." Nonetheless, this Court and the CAFC have held that the circumstances supporting a particular

---

[54] See Final Decision Memo at 9 and 11, P.R. 323.
[55] See id.
[56] See id. at 19.
[57] See id. at 12 (emphasis added).

16

market situation must be "particular" to producers of the subject merchandise during the relevant period. In the context of market distortions allegedly caused by low-priced imports of steel from China such as HRC, this Court and the CAFC have repeatedly held that the record must show "sufficient particularity" for that circumstance to establish a particular market situation.

For example, in Nexteel II, the CAFC affirmed this Court's holding that Chinese imports of HRC into Korea were not particular to Korea because the alleged imports were not "especially targeted towards Korea alone."[58] Similarly, in the Husteel decision,[59] this Court held that Commerce's PMS finding was unsupported by substantial record evidence because Chinese overcapacity is "not a phenomenon specific to the Korean market" and because "{a}lthough the statute under 19 U.S.C. § 1677b may not demand that a PMS be such that it only affects the subject market, there is no evidence on the record that Chinese overcapacity affects the Korean market in some way that is specific to the Korean market at all."[60] Accordingly, under this Court's and the CAFC's interpretations heretofore, Commerce may find a situation "particular" within the meaning of 19 U.S.C. § 1677b only where the record demonstrates circumstances unique to the subject country, rather than a generalized or commonly occurring condition. That required uniqueness must be supported by substantial record evidence, including evidence comparing the alleged situation in the subject market with conditions in other markets.

In the present case, Commerce's refusal to construe the statutory requirement of "particularity" under 19 U.S.C. § 1677b(e) consistently with this Court's and the CAFC's prior holdings was contrary to law. More importantly, Commerce's "particularity" finding was unsupported by substantial record evidence because the record contains no comparative analysis

---

[58] See Nexteel II, 28 F. 4th at 1237 (emphasis added).
[59] See Husteel Co., Ltd. v. United States, 426 F. Supp. 3d 1376 (Ct. Int'l Trade 2020).
[60] Id., 426 F. Supp. 3d at 1391 (emphasis added).

showing that Chinese imports of HRC into Taiwan—even assuming "increasing import volume and decreasing prices" were *unique* to, "targeted towards," or "specific to" the Taiwanese HRC market. To the contrary, Commerce acknowledged that "China's dominance in the global steel industry as the world's largest steel producer is well-documented,"[61] and that "Commerce has previously found China's capacity and production compared to the rest of the world to have a distortive impact on global markets under the TPEA."[62]

Moreover, the *Taipei Times* news article on which Commerce heavily relied in reaching its market-distortion finding for Taiwan shows that CSC planned to reduce its HRC prices "as global steel market grapples with China's excessive exports of low-priced products,"[63] and there was no mention that China's excessive exports were "targeted towards" Taiwan. The same article further reported that "ArcelorMittal SA, the world's second-largest steel producer, earlier this month said China's aggressive exports were creating problems for the global steel industry. . . ."[64] Citing data gathered by CSC, the article also reported that steel exports from China increased in volume while decreased in prices, "both adding pressure on the global steel market."[65] It also stated that, in response to China's aggressive exports, "{c}ountries including Vietnam, Thailand, and Turkey have recently responded with trade measures, including anti-dumping complaints against China's hot-rolled steel products."[66] Thus, the *Taipei Times* news article on which Commerce heavily relied in the Final Determination confirms that China's

---

[61] Final Decision Memo at 11, P.R 323.
[62] Id.
[63] See PMS Allegation at Ex. 10, C.R. 103-105, P.R. 165-167.
[64] Id.
[65] Id.
[66] Id.

overcapacity was a global phenomenon and that China's aggressive exports of steel products, including HRC, were not *unique* to, "targeted towards," or "specific to" Taiwan.

In light of the foregoing, Commerce's finding that Chinese HRC imports into Taiwan satisfied the statutory "particularity" requirement under 19 U.S.C. § 1677b(e) was contrary to law and unsupported by substantial record evidence.

### B.    Commerce's Market Distortion Finding of HRC in Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence

1.    Commerce failed to make the statutory finding that Yieh Phui's cost for steel coils did not "accurately reflect the cost of production in the ordinary course of trade"

Under 19 U.S.C. § 1677b(e)(1), Commerce is required to calculate CV by including "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade."  Through the 2015 TPEA amendments noted above, Commerce is permitted to use "any other calculation methodology" when calculating CV, "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[67]  Under 19 U.S.C. § 1677b(15), the term "ordinary course of trade" is defined as "conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."

Thus, before Commerce may use "any other calculation methodology" to calculate CV based on a PMS, it must find that the alleged market distortion caused by low-priced Chinese

---

[67] TPEA at id. (emphasis added).

HRC imports caused Yieh Phui's costs to fail to "accurately reflect the cost of production in the ordinary course of trade." To support that finding, Commerce must identify how the cost of producing CORE deviated from "conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." In the absence of such a finding, Commerce may not depart from the normal statutory cost-calculation methodology.

In the Final Determination, Commerce concluded that a PMS existed in Taiwan with respect to HRC, which are the primary material inputs used in the production of CORE. But Commerce never found that the prices paid by Yieh Phui for those materials did not "accurately reflect the cost of production in the ordinary course of trade." Indeed, Commerce made no findings whatsoever as to what the "cost of production in the ordinary course of trade" for HRC in Taiwan might have been[68] without the Chinese imports of HRC into Taiwan, neither on a macro basis for the entire Taiwanese HRC market, nor a micro basis for Yieh Phui.[69]

Instead, Commerce largely relied on the CSC price-cutting plan reported in a *Taipei Times* news article allegedly to counter the low-priced Chinese imports of HRC in forming its conclusion of market distortions with respect to HRC. In other words, Commerce concluded that the pricing behavior of CSC, the dominant domestic steel producer in Taiwan, was sufficient evidence of market impact regardless of whether record evidence demonstrated that Chinese

---

[68] See Nexteel II, 28 F. 4th at 1234 (emphasis added). We note that, in the present case, Commerce failed to consider "evidence that costs do not differ at all from what they would have been in the ordinary course of trade would 'fairly detract[ ] from the substantiality of the evidence.'"

[69] See id. at 1236. We further note that the CAFC held in that case that Commerce speculated that strategic alliances affected the Korean HRC market as a whole but without showing either market-wide distortions or respondent-specific distortions.

HRC imports actually distorted Yieh Phui's input costs or caused those costs to depart from costs in the ordinary course of trade.

Commerce's finding that distortions existed in the Taiwanese HRC market was, on its face, insufficient to satisfy the statutory test. Absent record evidence demonstrating that Yieh Phui's HRC costs did not "accurately reflect the cost of production in the ordinary course of trade," Commerce had no lawful basis to invoke its cost-based PMS authority. Commerce's cost-based PMS finding was therefore contrary to law and unsupported by substantial record evidence.

> 2.      Commerce failed to properly weigh the record evidence in reaching its market-distortion finding with respect to HRC prices in Taiwan

In the Final Determination, Commerce failed to reasonably weigh the record evidence in reaching its market-distortion finding with respect to HRC prices in Taiwan. Rather than assessing the record as a whole, Commerce relied heavily on a *Taipei Times* news article describing a price-cutting plan by Taiwan's largest steelmaker, CSC, and treated the pricing behavior of the dominant domestic steel producer as sufficient evidence of market impact. In doing so, Commerce ignored or failed to give adequate consideration to several important factors that would "fairly detract from"[70] its market-distortion finding.

First, Commerce failed to account for the limited magnitude of CSC's reported HRC price reduction. CSC reportedly planned to reduce HRC prices by only 600 New Taiwan Dollars ("NTD") per metric ton ("MT").[71] When compared with Yieh Phui's POI-average HRC

---

[70] See id., 28 F. 4th at 1234.
[71] See PMS Allegation at id., C.R. 103-105, P.R. 165-167.

21

consumption cost of [     ] NTD/MT, that reduction represented only [   ] percent (= 600 ÷ [

]).[72]

Moreover, the reported reduction was not attributable solely to Chinese HRC imports; the same article identified other market conditions, including "weak sentiment in the market dented by factors such as extreme weather, financial market turmoil and the off-season effect in summer."[73]  Thus, any portion of CSC's reported price reduction attributable to Chinese HRC imports would necessarily have been even smaller than the already minimal 600 NTD/MT reduction.  Commerce's failure to address this contradictory evidence renders its market-distortion finding unsupported by substantial record evidence.[74]

In addition, although Chinese HRC imports had limited market penetration in Taiwan during the POI—**3.27** percent in 2023 and **6.56** percent in 2024—Commerce unreasonably gave greater weight to the *Taipei Times* article describing CSC's price-cutting plan than to record evidence demonstrating low market penetration.  Commerce found that "{a} decision by Taiwan's largest steelmaker to lower prices in response to imports of Chinese HRC indicates that imports of HRC from China had a substantial impact on Taiwan's domestic HRC prices during the POI, regardless of the relatively low levels of market penetration."[75]  Yet, despite the minimal reported price reduction and the limited market penetration of Chinese HRC imports, Commerce unjustifiably treated CSC's pricing behavior as outweighing all contrary record evidence in reaching its market-distortion finding.

---

[72] See Yieh Phui Case Br. at 9, C.R 216, P.R. 312.
[73] See PMS Allegation at id., C.R. 103-105, P.R. 165-167.
[74] See Husteel, 426 F. Supp. 3d at 1390 (stating that "{t}he evidence {for a PMS finding} must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence.").
[75] See Final Decision Memo at 12-13, P.R. 323.

Commerce's failure to weigh properly the market penetration of Chinese HRC imports was inconsistent with its prior practice. As Plaintiff explained during the now-challenged underlying investigation of CORE from Taiwan, in every segment of the prior antidumping proceedings involving such CORE (i.e., Commerce Case Number: A-583-856, hereinafter referred to as "CORE I") in which a PMS was alleged, Commerce consistently found that no PMS existed in the Taiwanese steel market affecting the production cost of CORE.[76] In those proceedings, Commerce repeatedly rejected the argument that global steel overcapacity distorted the Taiwanese steel market through imports from China, Japan, Korea, and, in some instances, Russia. Yieh Phui's position in the now-challenged determination was that a key consideration in the earlier determinations was that the market penetration of the allegedly distortive HRC imports was too limited to support a PMS finding.[77]

For example, Plaintiff had cited the 2019–2020 administrative review of CORE I, in which a PMS allegation was based in part on the argument that global steel overcapacity distorted the Taiwanese steel market through imports of HRC from China, Japan, Korea, and Russia.[78] Plaintiff explained that, in reaching a negative PMS determination in CORE I, Commerce found that "the level of import penetration is important to take into account to

---

[76] See Yieh Phui Case Br. at 11-13 (citing Commerce Memorandum Re: 2017-2018 Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Steel Products from Taiwan: Decisions on Particular Market Situation Allegations, Sept. 16, 2019 ("CORE I AR2 PMS Decision"); Commerce Memorandum Re: 2018-2019 Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Steel Products from Taiwan: Decisions on Particular Market Situation Allegations, Nov. 17, 2020 ("CORE I AR3 PMS Decision"); and Commerce Memorandum Re: 2019-2020 Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Steel Products from Taiwan: Decisions on Particular Market Situation Allegations, Nov. 23, 2021 ("CORE I AR4 PMS Decision")), C.R. 216, P.R. 312.
[77] See id.
[78] See id. at 11-12 (specifically referencing the CORE I AR4 PMS Decision).

establish whether the effects of global steel overcapacity, regardless of its severity, can reasonably be attributed to the imports cited in the petitioner's allegation."[79]

The Final Determination stated that its "decisions in each proceeding stand on their own and are made on a fact-specific basis."[80] Commerce further relied on one purported distinction from the prior proceedings, stating that "the record in this investigation, unlike the records in the prior proceedings, shows that imports of Chinese HRC into Taiwan grew from 3.06 percent to over half of all imports by the POI."[81] Commerce's explanation, however, was insufficient because the relevant measure is not Chinese HRC imports as a share of all HRC imports into Taiwan. Rather, the relevant indicator is market penetration: Chinese HRC imports—the alleged source of market distortion—as a share of total apparent domestic HRC consumption.

Commerce's reliance on CSC's reported price-cutting plan could not substitute for substantial evidence that Chinese HRC imports actually penetrated the Taiwanese market to a degree sufficient to distort domestic HRC prices. By disregarding the limited share of Chinese HRC imports in apparent domestic consumption, departing from its prior practice without a reasoned explanation, and relying instead on Chinese imports as a share of total imports, Commerce failed to reasonably weigh the record evidence. Commerce's market-distortion finding with respect to HRC prices in Taiwan is therefore unsupported by substantial record evidence.

Substantial record evidence does not show that CSC's reported price-cutting plan was relevant to the POI. Yet, in the Final Determination, Commerce rejected Plaintiff's argument that CSC's price-cutting plan was not relevant to the POI. Commerce stated that although "the

---

[79] Id. at 12.
[80] See Final Decision Memo at 14, P.R. 323.
[81] Id.

formal execution of the plan came shortly after the end of the POI, we understand that decisions made with respect to significant business decisions [ ] are planned well in advance."[82] Commerce further explained that "although CSC recognized the need to lower prices to remain competitive with China's excessive exports of low-priced products, the plan was not immediately implemented."[83]

Commerce's explanation was insufficient because it rested on assumption rather than record evidence. The *Taipei Times* article was published on August 16, 2024, approximately one-and-a-half months after the POI ended, and reported that CSC reportedly would implement the price-cutting plan, if at all, the following month. The record contains no evidence that CSC executed any such price reduction during the POI or that CSC adopted the reported price-cutting plan in response to Chinese HRC imports made during the POI. Commerce's contemporaneity finding regarding CSC's price-cutting plan was therefore unsupported by substantial record evidence.

3.  Commerce Failed to Establish That the Alleged Market Distortions in the Taiwanese HRC Market Prevented a Proper Comparison for CORE

This Court has held that, "{t}o establish the existence of a PMS, Commerce must demonstrate both that there are distortions present in the market and that those distortions prevent a proper comparison of normal value with export price or constructed export price," and that both determinations "must be supported by substantial evidence."[84]

As part of its cost-based PMS finding and the resulting adjustment to Yieh Phui's HRC cost, Commerce found that distortions in the price of HRC combined with distortions in the price

---

[82] Id. at 13.
[83] Id.
[84] Husteel, 426 F. Supp. 3d at 1390.

of <u>CORE</u> create a PMS that prevents a proper comparison with U.S. price. In other words, Commerce concluded that the "combined" effect of alleged market distortions involving two different products—HRC and CORE—prevented a proper comparison with U.S. prices. That finding was contrary to law and unsupported by substantial record evidence.

First, the alleged market distortions with respect to HRC in Taiwan would not prevent a proper comparison with U.S. prices because, as the CAFC held, "{a} PMS that affects costs of production would presumably affect prices for domestic sales and export sales. . . ."[85] Even if Chinese HRC imports distorted the Taiwanese HRC market, the allegedly distorted HRC prices used as material costs by CORE producers in Taiwan, including Yieh Phui, would affect both home-market prices and U.S. prices for CORE. Because the alleged reduction in HRC costs would affect both sides of the dumping equation, Commerce could not reasonably find that distortions in the HRC market alone prevented a proper comparison.[86] Commerce, however, failed to explain how distortions in HRC prices alone would prevent a proper comparison of normal value with U.S. prices for CORE.

Second, the alleged market distortions affecting CORE in Taiwan—even if relevant to the price comparison for CORE—could not have affected HRC prices in Taiwan or justified an adjustment to Yieh Phui's HRC costs.

Commerce could invoke "any other calculation methodology" under 19 U.S.C. § 1677b(e) only if it found that a PMS caused "the cost of materials and fabrication or other processing" to "not accurately reflect the cost of production in the ordinary course of trade." Here, the relevant cost-based PMS inquiry concerned HRC, <u>not CORE</u>. Commerce acknowledged that Yieh Phui

---

[85] <u>Id</u>. at 1388.
[86] <u>See id</u>. at 1391-92.

used HRC as the primary material input to produce CORE, the subject merchandise.  The record contains no evidence that Yieh Phui used CORE as an input for further processing in producing CORE.  More importantly, the record contains no evidence that the alleged distortions in the Taiwanese CORE market, standing alone, affected the <u>upstream</u> Taiwanese HRC market or caused Yieh Phui's HRC costs—its costs for the primary input used to produce CORE—to depart from costs in the ordinary course of trade.  Thus, Commerce's reliance on alleged distortions in the Taiwanese CORE market cannot support its cost-based PMS finding or the resulting adjustment to Yieh Phui's HRC costs.

In sum, neither of the two above-mentioned factors, standing alone, could support Commerce's cost-based PMS finding.  Commerce's "combined" effect finding was likewise untenable because "a reasonable mind could not find that 'individually the facts would not support a particular market situation, but when viewed as a whole, these same facts could support the opposite conclusion.'" [87]  Commerce's decision in this regard was therefore contrary to law and unsupported by substantial evidence.

## IV.    COMMERCE'S DECISION REGARDING A SALES-BASED PMS FINDING AS REGARDS PLAINTIFF IN THE <u>FINAL DETERMINATION</u> WAS CONTRARY TO LAW AND UNSUPPORTED BY SUBSTANTIAL EVIDENCE

As this Court explained in <u>Husteel</u>, "{i}f a PMS prevents a proper comparison with export price or constructed export price, sales would indeed be considered outside the ordinary course of trade; as such, they shall be disregarded."[88]  Alternatively, "the existence of the PMS would justify Commerce using third country sales or constructed value."[89]  Thus, before Commerce

---

[87] <u>Nexteel Co., Ltd. v. United States</u>, 450 F. Supp. 3d 1333, 1338 (Ct. Int'l Trade 2020) ("<u>Nexteel I</u>").
[88] <u>Husteel</u>, 426 F. Supp. 3d at 1388 (citing 19 U.S.C. § 1677b(a)(1) and 19 U.S.C. § 1677(15)).
[89] <u>Id</u>. (citing 19 U.S.C. §§ 1677b(a)(1)(B)(ii), (a)(4)).

may make what it characterizes as a sales-based PMS finding and disregard sales in a comparison market, Commerce must demonstrate that the alleged market situation was "particular" to the respondent or the subject market and that the particular market situation prevented a proper comparison with U.S. prices. More importantly, that sales-based PMS finding must also be supported by substantial record evidence.

In the Final Determination, Commerce continued to find that a sales-based PMS existed during the POI with respect to CORE prices in Taiwan, and it continued to disregard all of Plaintiff's reported home-market sales in calculating the dumping margin.[90] Commerce based its sales-based PMS finding on two circumstances: (1) large imports of inexpensive Chinese HRC into Taiwan during the POI caused price distortions in Taiwan's HRC market and "the distortion in the price of HRC as an input distorts the price of CORE in Taiwan's home market" and (2) "Chinese steel overcapacity and its shipments of CORE to Taiwan had a particular and distortive impact on Taiwanese CORE prices."[91] As explained below, these two factors, whether considered individually or collectively, do not support Commerce's sales-based PMS finding. This Court should therefore hold Commerce's sales-based PMS finding contrary to law and unsupported by substantial record evidence.

> **A. Commerce's Sales-Based PMS Finding Based on Alleged Low-Priced Chinese HRC Imports into Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence**

As explained above, Commerce's reliance on alleged low-priced Chinese HRC imports into Taiwan in reaching its cost-based PMS finding was contrary to law and unsupported by

---

[90] See Post-Prelim. Analysis Memo at 11-13, C.R. 210, P.R. 165-157; and Final Decision Memo at 16-18, P.R. 323.
[91] See Final Decision Memo at 16-18, P.R. 323.

substantial record evidence. Likewise, Commerce's sales-based PMS finding based on alleged low-priced Chinese HRC imports into Taiwan was contrary to law and unsupported by substantial record evidence.

First, as also explained above, the alleged Chinese HRC imports were not "particular" to Taiwan. Plaintiff incorporates by reference its argument regarding the statutory particularity requirement in connection with Commerce's cost-based PMS finding and applies that argument equally to Commerce's sales-based PMS finding.

Second, as also explained above, Commerce's market-distortion finding with respect to Taiwan's HRC market was contrary to law and unsupported by substantial record evidence. Commerce failed to make the statutory finding that Yieh Phui's steel-coil costs did not "accurately reflect the cost of production in the ordinary course of trade"; failed to properly weigh the record evidence in reaching its market-distortion finding with respect to HRC prices in Taiwan; and failed to establish that the alleged distortions in the Taiwanese HRC market prevented a proper comparison with U.S. prices for CORE. Plaintiff incorporates by reference those arguments made in connection with Commerce's cost-based PMS finding and applies them equally to Commerce's sales-based PMS finding.

Accordingly, the same defects that undermine Commerce's cost-based PMS finding based on alleged low-priced Chinese HRC imports also undermine Commerce's sales-based PMS finding based on those imports. Because the record does not show that Chinese HRC imports were particular to Taiwan, distorted Taiwan's HRC market, or prevented a proper comparison with U.S. prices for CORE, Commerce could not lawfully rely on those imports to disregard Yieh Phui's home-market sales. Commerce's HRC-based sales PMS finding was therefore contrary to law and unsupported by substantial record evidence.

29

1. <u>Commerce's Sales-Based PMS Finding Based on Alleged Low-Priced Chinese Imports of CORE Into Taiwan Was Contrary to Law and Unsupported by Substantial Record Evidence</u>

   a. The alleged low-priced imports of Chinese CORE into Taiwan were not "particular" to Taiwan

In the <u>Final Determination</u>, Commerce continued to find that declining prices of Chinese CORE imported into Taiwan contributed to a sales-based PMS.[92]  In response to Plaintiff's argument that Commerce failed to show how those imports were "particular" to Taiwan, Commerce explained that a market situation may be "particular" even if similar conditions exist elsewhere, so long as the distortion affects prices in the subject country.[93]  According to Commerce, record evidence showed that "China's overcapacity has a distortive impact on global steel markets"[94] and that "the prices of Chinese imports of CORE into Taiwan declined more significantly between 2023 and 2024 than the prices of imports of CORE from all countries."[95]  Commerce further found that CSC's announcement of domestic CORE price reductions supported its finding of a particular and distortive impact.[96]  Commerce concluded that "Chinese steel overcapacity and its shipments of CORE to Taiwan had a particular distortive impact on Taiwanese CORE prices."[97]

As explained above, the statute does not define the term "particular market situation." Nonetheless, this Court and the CAFC have held that the circumstances supporting a particular market situation must be "particular" to producers of the subject merchandise during the relevant

---

[92] See <u>Final Decision Memo</u> at 17-18, P.R. 323.
[93] See <u>id</u>. at 17 (citing 19 CFR § 351.416(e)(1)(i)).
[94] <u>Id</u>.
[95] <u>Id</u>.
[96] <u>Id</u>. at 18.
[97] <u>Id</u>.

period.  In the context of market distortions allegedly caused by low-priced imports of steel from China, this Court and the CAFC have repeatedly held that the record must show "sufficient particularity" for that circumstance to establish a particular market situation.

As also explained above, in Nexteel II, the CAFC affirmed this Court's holding that Chinese imports of HRC into Korea were not particular to Korea because the alleged imports were not "especially targeted towards Korea alone."[98]  Similarly, in Husteel, this Court held that Commerce's PMS finding was unsupported by substantial record evidence because Chinese overcapacity is "not a phenomenon specific to the Korean market"[99] and because "{a}lthough the statute under 19 U.S.C. § 1677b may not demand that a PMS be such that it only affects the subject market, there is no evidence on the record that Chinese overcapacity affects the Korean market in some way that is specific to the Korean market at all."[100]  Accordingly, under this Court's and the CAFC's interpretation, Commerce may find a situation "particular" within the meaning of 19 U.S.C. § 1677b only where the record demonstrates circumstances *unique* to the subject country, rather than a generalized or commonly occurring condition.  That required *uniqueness* must be supported by substantial record evidence, including evidence comparing the alleged situation in the subject market with conditions in other markets.  None such evidence appeared in Commerce's Final Determination.

In the present case, Commerce's refusal to construe the statutory requirement of "particularity" under 19 U.S.C. § 1677b consistently with this Court's and the CAFC's prior holdings was contrary to law.  More importantly, Commerce's "particularity" finding was unsupported by substantial record evidence because the record contains no comparative analysis

---

[98] See Nexteel II, 28 F. 4th at 1237 (emphasis added).
[99] See Husteel, 426 F. Supp. 3d at 1391 (emphasis added).
[100] Id. (emphasis added).

showing that Chinese imports of CORE into Taiwan—even assuming "the prices of Chinese imports of CORE into Taiwan declined more significantly between 2023 and 2024 than the prices of imports of CORE from all countries"—were *unique* to, "targeted towards," or "specific to" the Taiwanese CORE market. To the contrary, Commerce acknowledged that "China's overcapacity has a distortive impact on global steel markets,"[101] and that "Commerce has previously found China's capacity and production compared to the rest of the world to have a distortive impact on global markets under the TPEA."[102]

Moreover, the *Taipei Times* news article on which Commerce heavily relied in reaching its market-distortion finding for Taiwan shows that CSC planned to reduce its CORE prices "as global steel market grapples with China's excessive exports of low-priced products"[103] and there was no mention that China's excessive exports were "targeted towards" Taiwan. The same article further reported that "ArcelorMittal SA, the world's second-largest steel producer, earlier this month said China's aggressive exports were creating problems for the global steel industry . . . ."[104] Citing data gathered by CSC, the article also reported that steel exports from China increased in volume while decreased in prices, "both adding pressure on the global steel market".[105] It also stated that, in response to China's aggressive exports, "{c}ountries including Vietnam, Thailand and Turkey have recently responded with trade measures, including anti-dumping complaints against China's hot-rolled steel products."[106] Thus, the *Taipei Times* news article on which Commerce heavily relied confirms that China's overcapacity was a global

---

[101] See Final Decision Memo at 11, P.R. 323.
[102] Id. at 17.
[103] See PMS Allegation at Ex. 10, C.R. 103-105, P.R. 165-167.
[104] Id.
[105] Id.
[106] Id.

phenomenon and that China's aggressive exports of steel products, including CORE, were not *unique* to, "targeted towards," or "specific to" Taiwan.

In light of the foregoing, Commerce's finding that Chinese CORE imports into Taiwan satisfied the statutory "particularity" requirement under 19 U.S.C. § 1677b was contrary to law and unsupported by substantial record evidence.

> b. Commerce failed to properly weigh the record evidence in reaching its market-distortion finding with respect to Taiwan's CORE market

Like its cost-based PMS finding, Commerce's sales-based PMS finding exhibited identical defects by failing to properly weigh the record evidence in reaching its market-distortion with respect to CORE prices in Taiwan. Instead, Commerce heavily relied on a *Taipei Times* news article describing a price-cutting plan for CORE by Taiwan's largest steelmaker (i.e., CSC)[107] and concluded that the pricing behavior of the dominant domestic steel producer in Taiwan was sufficient evidence of market impact. Commerce, however, either ignored or failed to give adequate consideration to several important factors that would "fairly detract from"[108] its market-distortion finding.

First, Commerce failed to account for the limited magnitude of CSC's reported price reduction for hot-dip galvanized steel, a type of CORE. CSC reportedly planned to reduce prices for hot-dip galvanized steel by only 500 NTD per metric ton.[109] When compared with Yieh Phui's POI-average sales price of [    ] NTD/MT for the same product, that reduction represented only [  ] percent (= 500 ÷ [    ]).[110] Moreover, the reported reduction was not attributable solely to Chinese CORE imports; the same article identified other market conditions, including "weak

---

[107] See id.
[108] See Nexteel II, 28 F. 4th at 1234.
[109] See PMS Allegation at id., C.R. 103-105, P.R. 164-167.
[110] See Yieh Phui Case Br. at 20, C.R 216, P.R. 312.

33

sentiment in the market dented by factors such as extreme weather, financial market turmoil and the off-season effect in summer."[111]  Thus, any portion of CSC's reported price reduction attributable to Chinese CORE imports would necessarily have been even smaller than the already minimal 500 NTD/MT reduction.  Commerce's failure to address this contradictory evidence renders its market-distortion finding unsupported by substantial record evidence.[112]

Second, although Chinese CORE imports had limited market penetration in Taiwan during the POI—**1.72** percent in 2023 and **3.05** percent in 2024—Commerce unreasonably gave greater weight to the *Taipei Times* article describing CSC's price-cutting plan than to record evidence demonstrating low market penetration.  Commerce found that "{a} decision by Taiwan's largest steelmaker to lower prices in response to imports of Chinese CORE indicates that imports of CORE from China had a distortive impact on Taiwan's domestic CORE prices during the POI, regardless of the level of price reduction or the level of market penetration."[113]  Yet, despite the minimal reported price reduction and the limited market penetration of Chinese CORE imports, Commerce unjustifiably treated CSC's pricing behavior as outweighing all contrary record evidence in reaching its market-distortion finding.  As also explained above in the section with respect to HRC, Commerce's failure to properly account for the level of market penetration, either for HRC or CORE, was inconsistent with its prior practice.

Third, substantial record evidence does not show that CSC's reported price-cutting plan for CORE was relevant to the POI.  In the Final Determination, Commerce rejected Plaintiff's argument that CSC's price-cutting plan was not relevant to the POI.  Citing its explanations with

---

[111] See PMS Allegation at id., C.R. 103-105, P.R. 164-167.

[112] See Husteel, 426 F. Supp. 3d at 1390 (stating "{t}he evidence {for a PMS finding} must be sufficient that a reasonable mind might accept the evidence as adequate to support its conclusion while considering contradictory evidence.")

[113] See Final Decision Memo at 18, P.R. 323.

34

PUBLIC VERSION

respect to HRC, Commerce rejected Plaintiff's argument in this regard.[114]  Nonetheless, as explained above, Commerce's explanation was insufficient because it rested on assumption rather than record evidence.

The *Taipei Times* article relied upon in the <u>Final Determination</u> was published on August 16, 2024, approximately one and a half months after the POI in the instant case ended, and reported that CSC would implement the price-cutting plan, if at all, the following month.  The record contains no evidence that CSC executed any price reduction during the POI or that CSC adopted the reported price-cutting plan in response to Chinese CORE imports made during the POI.  Commerce's contemporaneity finding regarding CSC's price-cutting plan was therefore unsupported by substantial record evidence.

**D.    COMMERCE'S CHOICE OF DATA SOURCE IN MAKING THE COST-BASED PMS ADJUSTMENT DOES NOT REPRESENT THE MOST REASONABLE AND BEST AVAILABLE INFORMATON ON THE RECORD**

Under 19 U.S.C. § 1677b(e), as amended by TPEA, Commerce may use "any other calculation methodology" when calculating CV only if a particular market situation exists such that the cost of materials and fabrication or other processing does not accurately reflect the cost of production in the ordinary course of trade.  Thus, any methodology Commerce adopts to make a cost-based PMS adjustment must be reasonable, supported by substantial evidence, and tailored to the distortion Commerce purports to measure.

In the <u>Final Determination,</u> Commerce continued to make an upward adjustment to Plaintiff's reported HRC costs by [   ] percent when calculating CV based on its cost-based PMS finding.[115]  Commerce calculated that adjustment by comparing Plaintiff's POI-average HRC

---

[114] <u>See</u> <u>id</u>.
[115] <u>See</u> <u>id</u>. at 18-20.  <u>See also</u> <u>Post-Prelim. Analysis Memo</u> at 14-15, C.R. 210, P.R. 301.

purchase price with the average price for hot-rolled band steel in the United States and Europe reported by *SteelBenchmarker*, a market intelligence publication submitted by Petitioners.[116]

Yieh Phui argued that the HRC price-reduction level reported in the *Taipei Times* article represented the best available information for calculating any cost-based PMS adjustment. Specifically, Yieh Phui explained that: (1) the *Taipei Times* article was a source Commerce itself deemed reliable and relied upon; (2) Yieh Phui's own cost and sales data, together with the price-reduction levels reported in that article, would provide a more accurate measure of any alleged market-distortion level; (3) the World Steel Dynamics *SteelBenchmarker* data do not reflect the actual transaction prices incurred by Yieh Phui; and (4) the *SteelBenchmarker* data reflect manufacturers in regions that do not share comparable economic conditions with Yieh Phui in Taiwan.[117]  However, Commerce rejected those arguments.[118]  A table comparing the calculations of the cost-based PMS adjustment proposed by Yieh Phui with the one eventually reached by Commerce is provided below for reference:

---

[116] See Post-Prelim. Analysis Memo at id.
[117] See Yieh Phui Case Br. at 21-24, C.R 216, P.R. 312.
[118] See Final Decision Memo at 20-21, P.R. 323.

36

**PUBLIC VERSION**

|  | Cost-Based PMS Adjustment Proposed by Yieh Phui | Commerce's Cost-Based PMS Adjustment |  |  |
|---|---|---|---|---|
| Yieh Phui's POI-average HRC Cost (NTD/MT)[119] | [ |  | ] | A |
| Yieh Phui's POI-average HRC Cost Converted to USD/MT[120] | [ |  | ] | B |
| POI-Average Price of HRB Reported in *SteelBenchmarker* (USD/MT)[121] | N/A | 825.04 |  | C |
| Price Reduction Level of HRC Reported in the Taipei Times news article (NTD/MT)[122] | 600 | N/A |  | D |
| Cost-Based PMS Adjustment Ratio to HRC | [ |  | ] |  |
|  | = D/A | = (C-B)/B |  |  |

Note: "HRB" represents hot-rolled band steel, a type of HRC.

Commerce rejected Plaintiff's arguments to use CSC's reported HRC price-reduction level in the *Taipei Times* article as the benchmark for a cost-based PMS adjustment reasoning that "changes in the prices of a distorted market do not affect the underlying distortion in the market,"[123] and that it "fails to see the logic in relying on changes to prices, which are themselves inherently distorted due to the market distortion, to 'undistort' the market."[124] Commerce further stated that "prices in a distorted market are unreliable,"[125] and that adjustments based on the price reductions identified in the *Taipei Times* article would merely continue to reflect distorted prices.[126]  That reasoning was unsustainable because it unreasonably

---

[119] See Yieh Phui Case Br. at 23, C.R 216, P.R. 312.
[120] See PMS Allegation at 20, C.R. 103-105, P.R. 165-167.
[121] Id.
[122] Id. at Ex. 10.
[123] Id. at 21.
[124] Id.
[125] Id.
[126] See id.

assumed, without record support, that every observed price movement in Taiwan's HRC market was inherently unreliable merely because Commerce had found a market distortion in that market.

Even assuming that low-priced Chinese HRC imports could support a cost-based PMS finding, the alleged distortion Commerce identified was limited to downward pressure on HRC prices in Taiwan. The relevant question, therefore, was how to measure the extent of any price effect attributable to those imports. Because Commerce itself relied heavily on CSC's reported price-reduction plan as evidence of market impact, and because the record contains no evidence that CSC operated outside market-economy principles, CSC's announced HRC price reduction was directly probative of the magnitude of the alleged distortion Commerce sought to measure.

Indeed, the administrative record contains no evidence that Taiwan generally, or the Taiwanese HRC market specifically, operated outside ordinary market-economy principles. Nor does the record show that CSC, as Taiwan's largest steelmaker and a market participant, acted irrationally or outside ordinary commercial practice when it announced its HRC price-reduction plan. To the contrary, CSC's reported price-reduction plan reflected a market-based competitive response to prevailing conditions, including import competition from China. Thus, Commerce's finding that CSC's reported price-reduction level was "inherently distorted" and "unreliable" was unsupported by substantial record evidence. Commerce also acted unreasonably by rejecting the price-reduction evidence reported in the *Taipei Times* article as a benchmark while simultaneously relying on that same evidence to support its cost-based PMS finding.

Accordingly, even if Commerce had lawfully found a cost-based PMS, its selected adjustment methodology was not supported by substantial evidence and did not constitute the most reasonable and best available information on the record. Commerce could not reasonably

38

rely on broad U.S. and European *SteelBenchmarker* data to inflate Plaintiff's Taiwan-specific HRC costs while disregarding record evidence that directly measured the alleged price effect in Taiwan. Commerce's selection of *SteelBenchmarker* data failed to reasonably correspond to the alleged Taiwan-specific distortion that Commerce purported to measure. By relying on generalized U.S. and European pricing data while rejecting contemporaneous Taiwan-specific evidence drawn from the same source Commerce used to establish the alleged PMS, Commerce failed to base its adjustment on the most reasonable and best available information. The Court should therefore hold that Commerce's [   ] percent cost-based PMS adjustment was contrary to law and unsupported by substantial evidence.

### CONCLUSION

In conclusion, Plaintiff Yieh Phui respectfully requests that the Court reverse Commerce's decision with regard to its cost- and sales-based PMS decisions or remand these decisions to Commerce for further consideration in accordance with the aforementioned comments.

Respectfully submitted,

  /s/ Kelly A. Slater  
Kelly A. Slater, Esq.
Edmund W. Sim, Esq.
Jay Y. Nee, Esq.

Appleton Luff Pte Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
301) 649-2149
slater@appletonluff.com

Dated:  July 21, 2026                    Counsel to Yieh Phui

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE GARY S. KATZMANN

| | |
|---|---|
| **YIEH PHUI ENTERPRISE CO., LTD.,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**UNITED STATES,** )<br>)<br>**Defendant.** )<br>) | **Consol. Ct. No. 26-00746** |

## ORDER

Upon consideration of the motion of Yieh Phui Enterprise Co., Ltd. ("Yieh Phui") for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, the Court, and all other papers and pleadings herein, and after due deliberation, having reached a decision, it is hereby

**ORDERED** that Yieh Phui's motion is hereby granted; and it is further

**ORDERED** that the final results in the antidumping investigation of Certain Corrosion-Resistant Steel Products from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value, 90 Fed. Reg. 42210 (Dep't Commerce Aug. 29, 2025), is hereby remanded to the U.S. Department of Commerce for a recalculation of Yieh Phui's antidumping duty margin consistent with this Court's opinion.

_____
Hon. Gary H. Katzmann, Judge

Dated: _____
New York, New York

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel at Appleton Luff Pte Ltd hereby certifies that the Memorandum of Points and Authorities in Support of Plaintiff Yieh Phui Enterprise Co., Ltd.'s Rule 56.2 Motion for Judgment on the Agency Record dated July 21, 2026 complies with the word-count limitation described in the Court's Standard Chambers Procedures.  The memorandum of points and authorities contains 12,341 words according to the word count function of the word processing software used to prepare the memorandum.

Respectfully submitted,


  /s/ Kelly A. Slater
Kelly A. Slater, Esq.
Edmund W. Sim, Esq.
Jay Y. Nee, Esq.

Appleton Luff Pte Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(301) 649-2149


Dated:  July 21, 2026                    Counsel to Yieh Phui Enterprise Co., Ltd.